**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CASE NO.: 3:21-cv-00900-MMH-JRK

**KYLE and TARAN HELM**, individually and as
next friends for **JANE DOE 1, JANE DOE 2** and
**JANE DOE 3**, et al.,

Plaintiffs,

v.

**DUVAL COUNTY SCHOOL BOARD**,

Defendant.

_____/

**SECOND AMENDED COMPLAINT FOR**
**CLASS ACTION RELIEF AND DAMAGES**

COME NOW KYLE and **TARAN HELM**, individually and as next friends

for **JANE DOE 1, JANE DOE 2**, and **JANE DOE 3**, et al., Plaintiffs on behalf of

themselves and all other similarly situated putative class members, sue Defendant,

**DUVAL COUNTY SCHOOL BOARD**, and through the Board, Duval County

Public Schools (collectively "DCPS") for adoption and implementation of the

Emergency Rule adopted August 23, 2021 (the "Mask Mandate") and request the

Court award Plaintiffs and the putative class members judgment against

Defendant for their damages.

## Introduction

> "Of all tyrannies, a tyranny sincerely exercised for the good of its victims may be the most oppressive. It would be better to live under robber barons than under omnipotent moral busybodies."
>
> —C.S. Lewis

Is it acceptable for the School Board to inflict harm on certain students in an ill-founded attempt to reduce the case count of one specific virus? Just how much harm to any single kid is the School Board willing to accept in the pursuit of its ends? The only civilized answer must, of course, be "none." What justifies the elevation of statutorily-vested School Board powers over the Constitutional rights of parents and their children? Just how much financial hardship, anxiety, and heartache can the School Board mete out to parents who differ from the School Board in their view of what is best for *their* children?

The enactment of the Mask Mandate on August 23, 2021, perfectly illustrated the risks of giving unilateral "emergency powers" to School Board members and DCPS officials, who, once possessed with these powers, wield them like a gorilla with an oversized paint brush, blotting out valid concerns of parents over *their* kids' particular health issues, social development, emotional well-being, and educational progress. The Mask Mandate co-opted the Plaintiffs' children and trampled their Constitutional rights while ignoring the data showing that mask mandates had no effect statewide (among Florida's sixty-seven counties and comparing Covid numbers in those with and without mask mandates). The

message was simple: "We hold the power, and we will weaponize it against you at a moment's notice. We know better than parents how to raise and protect their kids. And your Constitutional rights be damned."

More than eighteen months after Covid-19 was unleashed upon the western world, with every citizen of this State having had more than adequate time to inform him or herself of the risks of Covid-19, the potential mitigation measures, and each having made an independent judgment and decision about how to adapt to the reality that Covid-19 was not going away, the School Board called an "emergency" meeting for Monday, August 23rd, with initial notice sent out on Sunday, August 22nd. Following their weekend backroom discussions, the School Board arrived to "listen" to parents, who remained uninformed of the School Board's true agenda and oblivious to the fact that the School Board had arrived with an Emergency Rule (drafted over the weekend no doubt) in hand. After being faced with intense opposition from parents at the "emergency" meeting, these parents providing data to demonstrate the ineffectiveness of forced masking and relaying personal and traumatic experiences lived by their children under masks, the School Board pulled out its Emergency Rule from under the table and signed it.  The parents in attendance were left in the dark about the School Board's true intentions and the pre-ordained outcome of the "emergency" meeting because the

Emergency Rule was not noticed or circulated for public comment ahead of the meeting.

In obstinate defiance of the State, the County, the court system, and the community represented at the "emergency" meeting, the School Board implemented the most destructive and restrictive of all potential alternatives: its odious involuntary mask mandate for children. DCPS clutched onto this harmful policy in spite of the fact that the State rejected forced masking, the County rejected forced masking, the First District Court of Appeal (with jurisdiction over Duval County) had previously determined that forced masking was violative of Constitutional rights, the Florida Department of Health rejected forced masking and required that parents be given the right to opt-out of any student masking policy at the parent's *sole discretion*, and the Florida Department of Education had informed counties around the State that their mask policies were not making any difference in slowing the spread of Covid-19 (that is, the precipitous drop in Covid cases was uniform across the State regardless of any School District's masking policies) and they should allow students to opt-out, without conditions. Had the School Board only spent its weekend looking at the available data, rather than secretly drafting its Emergency Rule, it would have realized that there is and was no statistically significant difference in the Covid-19 case numbers between the counties in Florida that had and never had mask mandates. The same is true of

4

states across the United States, and indeed, entire countries who never imposed mask mandates on their citizens.

Notwithstanding all of this, the School Board and DCPS bureaucrats irrationally, arbitrarily, and capriciously pushed forward with perhaps the *most* restrictive means of trying to mitigate the Covid-19 cases in DCPS schools, and without proper consideration of the available *less* restrictive alternatives. Even more fatally, the School Board engaged in willful and inhumane blindness to the harms it caused to many of its students, each of whom has a story to tell about how the mask has caused them physical discomfort, anxiety, depression, destroyed their love of going to school, hampered their education, exacerbated their medical condition, and on and on and on. Parents were forced to withdraw their children from school to avoid these harms and protect their children from the School Board's unrelenting madness. A small minority of counties across the State took similar draconian action in response to the increase in Covid cases seen at the beginning of the school year, and the majority of these defiant counties abandoned their mask mandates long before the Defendant was forced to comply with the law. Stubbornly, DCPS remained a holdout, one of only three or four of the sixty-seven counties in the State with forced masking, despite a precipitous drop in cases in Duval County and within DCPS schools. Despite internal dissent, the School Board took action to implement a permanent policy to allow for forced masking at

the Superintendent's discretion under the guise of a policy retitled "Control of Communicable Diseases". The School Board indicated that its goal was to implement the new policy before relaxing the Emergency Rule, so that the power claimed during the so-called emergency was not surrendered willfully. Thus, the First District Court of Appeal *was required* to act, entering an Order on October 29, 2021 finding that Defendant had been "remarkably open in their defiance" of state law and agency rules. The Fourth Circuit Court entered a Writ of Mandamus on November 12, 2021 compelling Defendant to comply with state law and end its defiant violation of parents' and students' constitutional rights. In the months that Defendant enforced the lawless Mask Mandate, Plaintiffs were injured and pray that this Court will award damages as justice requires.

## Jurisdictional Allegations

1.    Plaintiffs each allege damages in excess of $30,000.00 exclusive of interest, costs, and attorney's fees, against a chartered county's public school district located in Florida.

2.    Plaintiffs also allege damages on behalf of a Florida class of similarly situated individuals with children attending Duval County Public Schools during the relevant time period and subject to the Mask Mandate, such damages in excess of $10,000,000.00.

3.     The Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453 and 1711-1715.  Jurisdiction is appropriate in Federal Court because this Court has primary jurisdiction to hear constitutional challenges brought pursuant to 42 U.S.C. §1983.

4.     Venue is proper in Duval County because it is where the Defendant is located, it is where the causes of action accrued, and it relates to certain orders issued by the Defendant or its purported agents within Duval County.  Further, venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391 because the events giving rise to these claims occurred in this jurisdiction.

## The Plaintiffs[1]

5.     KYLE and TARAN HELM are residents of Duval County. They are the parents and guardians of JANE DOE 1, JANE DOE 2, and JANE DOE 3, who all attend public school in Duval County (grades eight and seven). The Helms and their three children were harmed by the Mask Mandate. JANE DOE 1 suffers from single-sided deafness and is unable to function in a school environment that compels masking of both teachers and students alike. JANE DOE 2 suffers from severe anxiety when forced to wear a mask. Ms. Helm has a background in early child development and is qualified as both a parent and a professional to identify

---

[1] The Plaintiffs described in Paragraphs 5 through 14 are exemplar Class members demonstrating that the questions of fact (the extent and amount of damages) and the claims of the representative parties are typical of the claims of the Class.

the clinical and sub-clinical harms suffered by her daughters as a result of the Mask Mandate. Ms. Helm is immunocompromised and perceives Covid-19 as a real and persistent threat, but she has greater concerns about the immediate harm done to her daughters by the Mask Mandate. The Helms notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Helms were injured and damaged by the Defendant's actions.

6.     GARY and AMY DESJARDINS reside in Duval County and are the parents and guardians of JOHN DOE 1 and JANE DOE 4, who both attend public school in Duval County. The Desjardins and their children have been harmed by the Mask Mandate. JOHN DOE 1 has a reading disability, learns kinesthetically, and has a 504 Plan in place at the Duval County public school he attends. The Plan provides special resources and additional instruction and test-taking accommodations for JOHN DOE 1. With the 504 Plan in place, JOHN DOE 1 progressed well, and the effects of his reading disability were ameliorated - so much so that JOHN DOE 1 became a top-performing student. After the Defendant forced students to wear masks during the 2020-21 school year, JOHN DOE 1's academic performance regressed. In the first part of the 2021-22 school year, JOHN DOE 1 opted out of the mask requirement and flourished academically and emotionally. With the school-approved 504 Plan in place, the Desjardins requested

an exception for their son, JOHN DOE 1, but the Defendant did not honor their request. Mr. Desjardins notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Desjardins were injured and damaged by the Defendant's actions.

7.     MICHELLE PETTY is a resident of Duval County, whose daughters JANE DOE 5 and JANE DOE 6 attend sixth grade and kindergarten in public schools in Duval County. Ms. Petty and JANE DOE 5 and JANE DOE 6 have been harmed by the Mask Mandate. JANE DOE 5 attended school last year at a Duval County public school and was compelled to wear a mask. During the school year, JANE DOE 5 was sick on more than five occasions, having not previously been sick with the same frequency during prior years. JANE DOE 6 attended school unmasked last year and was not sick. Ms. Petty attempted to schedule an appointment with her children's physician in an attempt to comply with the Mask Mandate and in order to complete the Medical Certification. She was told that the first available appointment was October 24, 2021, meaning that her children were forced to attend school while masked for more than a month and a half following the Mask Mandate's planned implementation on September 7, 2021. Ms. Petty notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and Ms. Petty and her daughters were injured and damaged by the Defendant's actions.

8.      HEATHER WALLACE resides in Duval County and is the parent and guardian of JANE DOE 7 and JANE DOE 8, who both attend public school in Duval County (11th and 3rd grades). Ms. Wallace and her two daughters have been harmed by the Mask Mandate.  JANE DOE 7 suffered from persistent migraine headaches during the 2020-21 school year when masks were compelled. Outside of the 2020-21 academic year, and throughout the beginning of the 2021-22 school year, JANE DOE 7 has never suffered from persistent migraine headaches. JANE DOE 8 became physically ill on the playground and vomited while being compelled to wear her mask in the Florida heat. Other than while being forced to wear a mask, JANE DOE 8 has never suffered from heat exhaustion to the point of vomiting. Ms. Wallace does not currently have a family practitioner for her daughters but attempted to find one familiar with the Medical Certification with availability ahead of the Mask Mandate taking effect on September 7, 2021. She was unable to find a licensed health care provider to review the Medical Certification in order to comply with the Mask Mandate's opt-out. Ms. Wallace notified DCPS about these harms. . The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and Ms. Wallace and her daughters were injured and damaged by the Defendant's actions.

9.      GREGORY and KRYSTAL ADAME are residents of Duval County, whose child JANE DOE 9 attends second grade in a public school in Duval County.

10

The Adames and their daughter have been harmed by the Mask Mandate. During the previous school year while masking was compelled, JANE DOE 9 attended a public school that enforced the Mask Mandate. While she was playing outside during the school day and had removed her mask, a Duval County Public Schools teacher told JANE DOE 9 that she needed to put her mask back on or she would contract Covid-19. JANE DOE 9 complied and subsequently overheated while on the playground. After being taken inside, JANE DOE 9 vomited from heat exhaustion and was taken to the Emergency Room. At no other point in her life had JANE DOE 9 suffered from heat exhaustion or vomited due to exertion. The Adames notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Adames were injured and damaged by the Defendant's actions

10.    JEFF and CARRIE SELLERS reside in Duval County. They are the parents and guardians of JANE DOE 10, JOHN DOE 2, and JANE DOE 11, who all attend public school in Duval County (6th, 3rd and 1st grades). The Sellers and their three children have been harmed by the Mask Mandate. JANE DOE 10 became depressed, withdrawn, and regressed socially and suffered emotionally during DCPS' enforcement of its compelled masking policy during the 2020-21 school year. Additionally, JANE DOE 11 was prescribed an inhaler during the 2020-21 school year due to breathing difficulties - breathing difficulties that she

never experienced at any time in her life, both before and after being forced to wear a mask for extended periods of time while at her public school. The Sellers opted out of the DCPS mask policy at the beginning of the 2021-22 school year and their daughter JANE DOE 11 flourished and returned to her normal, social self while not being forced to wear a mask. JOHN DOE 2 also suffered with depression, anxiety, vision disturbances, and persistent headaches while masked during the 2020-21 school year, behaviors and conditions that he has never exhibited at any other time in his life. Similar to JANE DOE 11, JOHN DOE returned to normal without any symptoms of anxiety, depression, vision disturbances, or headaches during the 2021-22 school year while unmasked. The Sellers' religious beliefs inform their rightful desire to not force their children to wear masks as Defendant compelled, and the Mask Mandate interfered with the Sellers' God-given rights. The Sellers have a family practitioner for their children, and they were notified on September 1, 2021, that their family practitioner would not sign the Medical Certification necessary to comply with the Mask Mandate "unless their kids' ears are falling off." The Sellers were unable to locate a suitable licensed health care provider in order to complete the Medical Certification ahead of the September 7, 2021, implementation of the Mask Mandate. The Sellers notified DCPS about these harms. The Defendant refused to take any remedial

action prior to entry of the Writ of Mandamus, and the Sellers were injured and damaged by the Defendant's actions.

11.     SEAN and CAROLINA COLLINS reside in Duval County and are the parents and guardians of JOHN DOE 3. JOHN DOE 3 attends public school in Duval County and is currently in kindergarten. The Collins and their son have been harmed by the Mask Mandate. Mr. and Mrs. Collins opted their son out of the mask requirement instituted by DCPS at the beginning of the 2021-22 school year. Despite having complied with DCPS' policy, DCPS teachers and administrators at JOHN DOE 3's school repeatedly placed a mask on JOHN DOE 3 despite the clear intent of Mr. and Mrs. Collins as evidenced by their opt-out form submitted to DCPS. Mr. Collins reminded the school on several occasions that his son was not to be masked, and his requests were ignored. The Collins were recent transplants from Texas and did not have a family practitioner for their son, yet they sought out a health care provider to complete the Medical Certification ahead of the September 7, 2021, implementation of the Mask Mandate. The Collins have DCPS about these harms. . The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Collins were injured and damaged by the Defendant's actions

12.     ROBBY and TAMSYN BELL reside in Duval County and are the parents and guardians of JANE DOE 12, JANE DOE 13, and JANE DOE 14, who

all attend public school in Duval County (12th and 11th grades). The Bells and their three daughters have been harmed by the Mask Mandate. All of the Bell's daughters suffered from exhaustion, fatigue, and persistent headaches during the 2020-21 school year in which they were forced to wear masks while at school. On repeated occasions, teachers at the Bell daughters' school intimidated and threatened the Bell girls when they momentarily removed their masks. The Bell daughters have always been enthusiastic about attending school, but grew fearful and reluctant to attend school. The Bells' family practitioner refused to sign the Medical Certification without further evaluation of the medical, physical, psychological, or other health harms being inflicted on the Bell daughters. The Bells have were unable to find a licensed health care provider to review the Medical Certification in order to comply with the Mask before it took effect on September 7, 2021. For this reason, the Bell daughters faced disciplinary action and intimidation at school when they failed to comply with the Mask Mandate due to their legitimate physical, medical, psychological, and other health concerns. The Bells notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Bells were injured and damaged by the Defendant's actions.

13.     STAN and KATIE LEWANDOSKI reside in Duval County and are the parents and guardians of JANE DOE 15 and JOHN DOE 4, who both attend public

school in Duval County (5th and 3rd grades). The Lewandoskis and their children have been harmed by the Mask Mandate.  JANE DOE 15 suffers from seasonal and food allergies and has difficulty breathing *without* a mask. JANE DOE 15's allergies were exacerbated while being forced to wear a mask during the 2020-21 school year. JANE DOE 15 suffered from social anxiety due to the necessity of removing her mask periodically due to her breathing difficulties. JANE DOE 15 expressed her intentions to comply with the Mask Mandate despite her medical conditions due to her fear of being bullied and ostracized if she did not comply. JOHN DOE 4 is active in youth sports where he does not have to wear a mask and was justifiably confused by the requirement that he wear a mask while at school beginning September 7, 2021. The Lewandoskis did not have a family practitioner for their children but due to the Mask Mandate they attempted to find one familiar with the Medical Certification with availability ahead of the Mask Mandate taking effect on September 7, 2021. Mrs. Lewandoski was informed by the pediatrician she contacted in an effort to complete the Medical Certification that there was no possibility of obtaining an appointment ahead of September 7, 2021. She was unable to find a licensed health care provider to review the Medical Certification in an attempt to comply with the Mask Mandate. Moreover, the Lewandoskis were not comfortable sharing sensitive health information with Defendant in order to comply with the Mask Mandate. The Lewandoskis reluctantly complied with the

Mask Mandate when it was implemented on September 7, 2021, due in part to their legitimate fear and past experience confirming that their children would have been socially excluded, intimidated, and threatened if they attended school without a mask. The Lewandoskis did not want to remove their children from their school despite the Mask Mandate because of the social and emotional upheaval that a sudden change would have caused. The Lewandoskis' children's school did not take any measures over the summer of 2021 to improve the air quality in the school. The Lewandoskis notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Lewandoskis were injured and damaged by the Defendant's actions

14.     MARLEATIA BESS and ROBIN FREEL are residents of Duval County and are parents and legal guardians of JANE DOE 16 and JOHN DOE 5. JANE DOE 16 and JOHN DOE 5 attend public schools in Duval County. Ms. Bess and Ms. Freel and their daughters have been harmed by the Mask Mandate. JANE DOE 16 is asthmatic and suffered from persistent headaches during the 2020-21 school year. Despite JANE DOE 16's medical condition, she was not given the option to not wear a mask at school. DCPS compelled Ms. Bess to enroll JOHN DOE 5 for in-person schooling during the 2020-21 school year, and forced JOHN DOE 5 to wear a mask, despite Duval County Public School's awareness and actual knowledge that JOHN DOE 5 has hearing and speech disabilities and is autistic.

For these reasons, JOHN DOE 5 had and has an Individualized Education Plan (IEP) approved by DCPS. Due to JOHN DOE 5's significant physical and medical impairments and the lack of accommodation from DCPS, Ms. Bess had no choice but to withdraw her son from school during the 2020-21 school year. Ms. Bess and Ms. Freel were informed by their children's physicians that they would not sign the Medical Certification for JANE DOE 16 and JOHN DOE 5's physical and medical conditions, and subsequently tried to locate an alternative health care provider. Ms. Bess and Ms. Freel were unable to obtain the requisite Medical Certifications for their children in time to comply with the Mask Mandate implementation on September 7, 2021. Ms. Bess and Ms. Freel notified DCPS about these harms. The Defendant refused to take any remedial action prior to entry of the Writ of Mandamus, and the Ms. Bess and Ms. Freel and their children were injured and damaged by the Defendant's actions

### Defendant, Duval County Public Schools

15.     Duval County Public Schools is a political subdivision of the State of Florida managed by its Superintendent, Diana Greene, who acts as Duval County Public Schools' chief executive, and a School Board comprised of seven members representing seven districts within Duval County (the "Board").

16.     Duval County Public Schools is an agency within the meaning of that term under Chapter 120, Florida Statutes, and its rulemaking authority is provided by that Chapter.

17.     Elizabeth Andersen is the Chair of the Board (the "Chair"). Duval County Public Schools may be served via service on the Chair, or on the Superintendent if the Chair is unavailable.

## Common Factual Allegations

### Mask Science

18.     On March 31, 2020, the U.S. Surgeon General said that the data does not support wearing masks, which are ineffective in preventing respiratory diseases and actually increase the risk of getting Covid-19. ("On an individual level, there was a study in 2015 looking at medical students and medical students wearing surgical masks touch their face on average 23 times...We know a major way that you can get respiratory diseases like coronavirus is by touching a surface and then touching your face so **wearing a mask improperly can actually increase your risk of getting disease. It can also give you a false sense of security.**")

19.     Masks do not protect wearers from airborne transmissible infectious agents. The Occupational Safety and Health Administration's ("OSHA") website plainly states that cloth face masks "**will not protect the wearer against airborne**

**transmissible infectious agents due to loose fit and lack of seal or inadequate filtration."**

20.     On June 8, 2020, the World Health Organization announced that "[f]rom the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual," casting serious doubt on the rationality and effectiveness of wearing masks to prevent Covid-19.

21.     In May 2021 — months behind its peer agencies and the scientific community —the CDC substantially revised its prior guidance, admitting that Covid-19 is *not* spread primarily through respiratory droplets, but rather is primarily spread through very fine airborne transmissible infectious agents. This fact casts serious doubt about the rationality and effectiveness of wearing masks to prevent Covid-19.

22.     While the CDC is a helpful resource for policy makers, it is irrational to rely solely on that public-health agency, which is not located in Florida, does not analyze Florida-specific issues, and is not familiar with the local climate, culture, and community. The problems of the CDC's well-known tardiness in updating its scientific guidance, and its constantly shifting advice on the tardy guidance it has issued, are a matter of public record.

23.     As recently as mid-May 2021, U.S. media were roundly criticizing the CDC for its sluggardly performance during the entire pandemic. For example:

[T]hroughout the health crisis, the CDC has been so slow to issue guidance in line with the research consensus on COVID-19 that it's brought new meaning to the concept of 'follow the science.' The CDC was several months late to the idea that surface transmission of the coronavirus is largely mythical. It was months late to the notion that the disease rarely spreads outdoors. Until this week, it continued to issue byzantine advice for vaccinated individuals even as evidence piled up that inoculated people are at extremely low risk of serious disease or transmission. **On vaccines and masks, the agency has been all over the place.**

The CDC's Big Mask Surprise Came Out of Nowhere, The Atlantic, May 15, 2021, *available online* at https://www.msn.com/en-us/news/opinion/the-cdc-e2-80-99s-big-mask-surprise-came-out-of-nowhere/ar-BB1gJTY8 (emphasis added).

24.     Despite this public lashing, the CDC is one of only two purported agency authorities relied upon by the School Board in adopting its Mask Mandate.

**The DCPS Mask Mandate**

25.     DCPS adopted its Mask Mandate in the form of the "Emergency Rule of the School Board of Duval County" at an "emergency" meeting held on August 23rd. A copy of the Mask Mandate is attached hereto as **Exhibit A**.[2]

26     The controversial Mask Mandate was implemented pursuant to §120.54(4), Florida Statutes. By using this emergency statute, DCPS was able to avoid many ordinary requirements for public notice of the intended policy, public comment, and public participation.

---

[2] Exhibits to the Second Amended Complaint are identical to those filed with the original Complaint, and are incorporated herein by reference. The exceptions are: FDOH's Emergency Rule 64DER21-15, which is attached hereto as a new Exhibit G; the First District Court of Appeal's Order attached as Exhibit H; and the Fourth Circuit's Order Granting Writ of Mandamus attached as Exhibit I.

27.    The Mask Mandate caused great public consternation and unhappiness. It divided neighbor from neighbor. It created a treasured "right" for parents who wanted their children to be masked, and it created a terrifying daily burden for parents who did not want their children to be masked. The Mask Mandate caused upheaval and financial hardship to families who believed they were settled in their chosen public school for the 2021-22 school year. Additionally, it caused anxiety and trepidation among children who lived through the masked dark ages of the 2020-21 school year.

28.    The Mask Mandate provided that "all students must wear a face covering that covers the nose and the mouth at all times while inside a school or any administrative facility, inside a building for purposes of a school-related or school-sponsored event (except as provided in administrative guidance for District athletics and performing arts, which will be conspicuously posted at District athletics and performing arts events), or on District-approved transportation." Mask Mandate, p. 4.

29.    The Board required Duval County students in kindergarten through twelfth grades, including Plaintiffs' children, to wear a face mask.

30.    Prior to enacting the Mask Mandate, the Board never studied potential harms to students and staff.

31.     After enacting the Mask Mandate, the Board never studied actual harms to students and staff.

32.     Neither the Board nor DCPS *ever* performed any "balancing of harms" analysis regarding the Mask Mandate.

33.     The Mask Mandate provided for an undefined process that would "provide for a parent to opt out their student from this policy due to a medical, physical, or psychological condition evidenced by a medical certification." Mask Mandate, p. 4. The Mask Mandate continues: "A face covering will not be required when it would cause an impairment due to an existing health condition as evidenced by a medical certification." Mask Mandate, p. 4.  The Mask Mandate did not set out the process, nor define what constituted an impairment in the eyes of DCPS.

34.     The Mask Mandate made no mention of efforts to be undertaken by DCPS to reduce any social stigma for a student who, for medical, physical, psychological, or other health reasons, could not or should not have worn a mask. Other school districts in the State that attempted to impose mask mandates *at least* recognized the potential psychological and emotional harm caused by being singled out and ostracized, especially at a young age.

35.     DCPS did not set forth any training or procedures for teachers, administrators, and staff in methods for reducing social stigma and minimizing

psychological trauma for students who obtained exemptions to the Mask Mandate. DCPS did not even attempt to prevent its own teachers and staff from participating in creating and perpetuating "mask stigma" towards students. Some DCPS teachers themselves participated in stigmatizing unmasked students and perpetrated the harm during the unconditional opt-out period that was in effect at the beginning of the 2021-22 school year.

36.     The Mask Mandate in Duval County, in fact, aimed to stigmatize and intimidate. DCPS stated that students who did not follow the guidelines could have been charged with a Code of Student Conduct infraction and been subject to the appropriate consequences. Subsequent to the School Board's adoption of the Mask Mandate, DCPS published disciplinary consequences to be imposed upon students who failed to comply via its website.

37     As a result, the social stigmatization of children who did not wear masks at school was not abated by DCPS under the Mask Mandate. Rather, DCPS opted for a punitive approach to enforce the social stigmatization of children who did not wear face masks.

38.     The uncontrolled social stigma rampant in DCPS's schools caused direct, immediate, and substantial psychological harm to the Plaintiffs' children.

39.     DCPS irrationally, arbitrarily, and capriciously instituted an Emergency Rule that created more questions than it answered, having left the entire process for obtaining a medical certification undefined.

40.     The Mask Mandate did not itself provide for any form to be used to request an exemption.

41.     On Thursday, August 26th, DCPS released its Covid-19 Face Covering Certification Form (the "Medical Certification") attached hereto as **Exhibit B**.

42.     The Medical Certification, as a supplement to the Mask Mandate, was facially void due to its ambiguity and vagueness. The Mask Mandate, as adopted and subsequently amended by the Medical Certification, did not inform parents which medical, physical, psychological, or other health conditions would be deemed sufficient by DCPS to justify opting out. Further, the Medical Certification only directed parents to: "Complete, sign, and return this form to your child's school." Nothing in the Mask Mandate set forth who at the school would review the sufficiency of the Medical Certifications returned, how the sensitive health information would be protected, or even attempted to outline the process for appealing a rejection by a DCPS school employee.

43.     The form completely disregarded the constitutional Right of Privacy belonging to the students and parents returning these Medical Certifications. In

being compelled to return these Medical Certifications to the school, the Plaintiffs were forced to disclose private health information to unidentified DCPS agents without limitation.

44.   The school administrators, teachers, and staff shared the sensitive information contained on signed Medical Certifications, and otherwise indiscriminately mishandled the sensitive health information in their possession.

45.   Having failed to set out any coherent process for handling and reviewing Medical Certifications, DCPS arbitrarily amended its rule to narrow the types of licensed health care providers that could provide medical opinions that masks are contraindicated and notified parents that their children's Medical Certifications were insufficient and would be disregarded. At least twice, DCPS broadened or narrowed its own definition of who it deemed to be a licensed health care provider. DCPS never provided any visibility into who made these decisions or how the sufficiency of submitted medical certifications was reviewed, nor has DCPS provided any basis for disregarding the opinions of licensed health care providers. Parents were left holding the bag for expenses to obtain medical certifications that DCPS deemed invalid and scrambled to understand DCPS' stance and acceptance policy on medical certifications.

46.   The failure of the School Board and DCPS to set out a rational, coherent policy and adjudicative process with respect to its Mask Mandate caused

emotional turmoil, financial hardship, and family upheaval within the County as families scrambled to understand the Mask Mandate, attempted to comply, arranged for appointments with their licensed health care providers, and considered their options to avoid allowing the School Board and DCPS to harm their kids indiscriminately.

47.     The aftershocks of the Mask Mandate's adoption on August 23rd reverberated throughout Duval County and caused direct, immediate, and substantial financial, emotional, and psychological harm to the Plaintiffs' and their children.

48.     DCPS completely failed to provide any expectations or guidance to the local healthcare community to provide certainty and predictability to the "process". As a result, local healthcare providers preemptively denied families requests for medical certifications by sending out notifications to their patients that they would only sign a Medical Certification for certain, specified conditions. DCPS's insufficient guidance created a community where parents of children with valid medical, physical, and psychological, and other health conditions *could not* opt-out as the Mask Mandate purportedly allowed them to do.

49.     The procedure for first obtaining an exemption from the Mask Mandate, and second, surviving whatever review process DCPS implemented behind closed doors to review the sufficiency of medical certifications, could not

have been more opaque and unavailable if DCPS had deliberately conspired to obstruct parents' access to such a procedure. In other words, the School Board and DCPS officials conspired to prevent parents from knowing whether their children would be able to opt-out of the Mask Mandate ahead of the mandate taking effect on September 7, 2021, and they continued to conspire to change the criteria on a rolling basis, without notice or consideration of the Plaintiffs' fundamental rights.

50.    The Duval County School Board joined five other county school boards throughout Florida and challenged the legitimacy of the FDOH rule and refused to comply with state law. Ultimately, Defendant lost its challenge, with the Florida Division of Administrative Hearings reinforcing that FDOH's rule was lawful, and Defendant was forced to comply and reinstate Plaintiff's Constitutional rights after the Fourth Circuit entered a Writ of Mandamus on November 12, 2021.

51.    Governor DeSantis has publicly stated that the School Boards should be sued for their actions.

### Plaintiffs' Children

52.    Except where otherwise noted, the Plaintiffs' children attend or attended public schools within Duval County and were subject to, and were harmed by, the Mask Mandate.

53.     The Plaintiffs' children were not allowed any exemption from the Mask Mandate or have been unlawfully required to "prove" harms caused by the Mask Mandate, without DCPS's consideration of known medical, physical, psychological, or other health considerations making masks contraindicated and detrimental for these children, and without regard for prior harms caused to them by forced masking.

54.     The Plaintiffs' children were treated as second-class citizens with diminished Constitutional rights.

55.     The Plaintiffs' children, in many cases, were preemptively denied exemptions from the Mask Mandate due to the ill-defined and ill-considered Emergency Rule and associated medical certification process.

56.     The Plaintiffs' children have been harmed as a direct result of the proper and improper application of the DCPS Mask Mandate.

57.     Plaintiffs' children did not have Covid-19 – or if they were infected, recovered quickly and certainly did not have Covid-19 for the nearly two months that the Mask Mandate was in effect. Plaintiffs' children did not pose a transmission risk for a disease they did not have.

58.     It is an undisputed fact that school children like the Plaintiffs' children were not the primary drivers of community spread of Covid-19.

59.     It is an undisputed fact that all Duval County teachers and staff had a full and fair opportunity to be vaccinated against Covid-19 with vaccines, which reportedly reduces the risk of suffering severe health consequences.

60.     It is an undisputed fact that many, if not most, Duval County teachers and staff are vaccinated against Covid-19.

61.     In short, those that are at serious risk of health complications from Covid-19 had adequate opportunity to protect themselves from the risk without requiring forced masking of children at school.

62.     Some of the Plaintiffs' children already had Covid-19 and were effectively shielded by antibodies, greatly reducing the chance of becoming a transmission risk for Covid-19 in the future and greatly reducing the potential health consequences of being re-infected with Covid-19.

63.     It is also an undisputed fact that school children like Plaintiffs' children, and their peers, were at an exceptionally low risk from suffering serious health effects from Covid-19.

64.     It is an undisputed fact that students — including the Plaintiffs' children —have and had less risk of dying from Covid-19 than from influenza even when unmasked.

65.     Implicitly recognizing these undisputed facts, the School Board focused only on the prevalence of Covid-19 in Duval County Public Schools

(absolute numbers) in the preamble to their Emergency Rule adopting the Mask Mandate and did not make any findings or hear any evidence concerning the severity of cases affecting school-age children in Duval County.

66.     Children like the Plaintiffs' children normally acquire lifelong immunities through ordinary exposure to a wide variety of common diseases at school, including respiratory viruses like Covid-19.

67.     Natural immunity to Covid-19 from previous infection is more protective and provides greater benefit than vaccination.

68.     For these reasons, some Plaintiffs made the reasoned judgment that the risk posed by natural infection or re-infection from Covid-19 and the follow-up health consequences were far outweighed by the harms caused to their children by forced masking, including anxiety, depression, difficulty breathing, chronic headaches, exacerbation of sensory issues and learning disabilities, developmental deficits, and reduced enjoyment of school, and to not be deprived of their singular opportunity to encounter Covid-19 naturally at school and develop lifelong natural immunity to the virus and its variants.

### DCPS Enforced the Mask Mandate
### in an Arbitrary and Capricious Manner

69.     DCPS intentionally or negligently failed to educate its teachers and staff how to consistently, rationally, and non-arbitrarily enforce the Mask Mandate.

70.    When questioned by Plaintiffs, DCPS administrators, teachers and staff were completely unprepared to address which medical, physical, psychological, or other health conditions would satisfy the wizard behind the curtain at DCPS who decided on the sufficiency of any Medical Certification completed by the parents and signed by a licensed health care provider as required.

71.    Similarly, DCPS administrators, teachers and staff were unequipped to answer how the sensitive health information on the medical certifications would be protected and disseminated within the DCPS system.

72.    The lack of uniform guidance and procedure led to conflicting answers from DCPS administrators, teachers, and staff, and predictably, confusion and anxiety among parents and children in the Duval County public school system.

73.    Under previous iterations of the Mask Mandate, DCPS's teachers and staff forced students to wear face masks *outdoors* under strenuous conditions at high temperatures.

74.    Plaintiffs were unable to obtain consistent or reliable answers concerning how their child's school would ensure that their children knew that they could remove and were reminded to remove their mask when playing or

running outdoors in the Florida heat, leading to predictable harm to Plaintiffs' children.

75.     Many students including Plaintiffs' children were subject to discipline and ridicule for violations of previous iterations of the Mask Mandate, and under the Mask Mandate, such discipline was inconsistently applied between similarly-situated students in an irrational, arbitrary, and capricious manner that varied widely from school to school, class to class, teacher to teacher, from indoors to outdoors, and even varied by time of day.

76.     As evidence of this likely harm, DCPS did not provide any guidance in the Emergency Rule regarding the constraints of potential disciplinary action and instead began its coercion campaign by issuing stern warnings through the press and otherwise about vague punishments to be doled out according to the Student Code of Conduct.

77.     DCPS later published disciplinary measures to be taken on its website, but such measures were applied inconsistently and enforcement is haphazard, at best.

### The Department of Education's Data — DCPS's Mask Mandate Did <u>Not</u> Work

78.     DCPS's Mask Mandate did not slow the spread of Covid-19.

79.     On April 14, 2021, the Florida Department of Education ("FDOE") sent official notice to the Superintendent of DCPS, as its chief executive officer,

stating unequivocally and without qualification that "**the data shows us that district's face covering policies do not impact the spread of the virus**" (bold-face and underlined emphasis in the original). A copy of the FDOE's April 14, 2021, letter (the "FDOE's Covid Guidance") is attached hereto as **Exhibit C**.

80.     The FDOE compared the Covid-19 performance in 27 county school districts having optional masking policies to the Covid-19 performance in 40 county school districts having mandatory masking policies.

81.     After reviewing the actual data, the FDOE's Chancellor concluded that "[t]he review of this data showed **no link** between face mask policies and counties' positivity rates" (emphasis added).

82.     The FDOE, in conjunction with a report on Florida's reopening from the CDC, concluded that "the health data on school campuses has increasingly bested the health data in communities at large, clearly other factors – **NOT face covering policies** – are driving healthy results for Florida's schools" (emphasis added).

83.     The FDOE's Chancellor of Public Schools' email dated Thursday, May 13, 2021, containing the FDOE's conclusions represented above, is attached hereto as **Exhibit D**.

84.     After DCPS implemented its Mask Mandate, the State Surgeon General and FDOE released similar comparative data for the 2021-22 school year

demonstrating that there was a precipitous drop in Covid-19 cases since the Mask Mandate was implemented, and the drop was uniform across Florida's sixty-seven counties regardless of mask policies.

85.     It was irrational, arbitrary, and capricious for DCPS to adopt, implement and continue to enforce the Mask Mandate when the undisputed facts showed that the Mask Mandate did not impact the case counts in any given Florida county's school district.

86.     In other words, DCPS's Mask Mandate policy was not scientifically supported and therefore there was no compelling government interest in forcing masks on children to attempt to achieve its stated objective of reducing Covid-19 cases in DCPS schools.

87.     Masks served **no remaining good in Duval County schools**.

88.     The DOE's Covid Guidance notified DCPS that "broad sweeping mandatory face covering policies **served no remaining good at this point in our schools**" (bold-face and underlined emphasis in the original).

89.     It was irrational, arbitrary, and capricious for DCPS to maintain the Mask Mandate when it served no remaining good in the schools.

90.     DCPS disputed these facts only indirectly in its Emergency Rule, by making vague references to remote political agencies (FDA, CDC) unconnected

and detached from Florida's government, geography, culture, climate, and community — and not through any rationally-based local analysis or science.

91.     DCPS did not introduce, nor refer to in its Emergency Rule, any data contradicting FDOE's Florida study regarding the effectiveness of masks to control case numbers across Florida, nor did it hear from anyone at the August 23rd "emergency" meeting suggesting that they were in possession of such contrary data.

92.     Neither the CDC nor the FDA undertook any analysis of the relevant data in Florida on a county-by-county basis to determine the effectiveness of mandatory masking of students in this State.

93.     DCPS's Mask Mandate was not based on science or reason, but instead some combination of the political leanings, emotions, irrational fears and psychological anxieties of its Superintendent and School Board Members.

94.     Masks generally harmed students by:

a)     inhibiting peer-to-peer learning in our classrooms;

b)     creating a barrier for students and families who would otherwise choose in-person instruction if the Mask Mandate were not in place; and

c)     impeding face-to-face instruction.

(the "General Harms").

95.     DCPS received actual notice of the General Harms when it received the FDOE's Covid Guidance.

96.     Although DCPS received actual notice of the General Harms, DCPS irrationally, arbitrarily, and capriciously failed to take any remedial action and continued to enforce its Mask Mandate.

97.     To be clear, since receiving notice, DCPS did not taken a single step to mitigate, reduce, or address in any way the General Harms, and instead maintained its policy requiring indoor masking at all times, for all ages, regardless of activity or learning environment.

98.     It was irrational, arbitrary, and capricious for DCPS to ignore the General Harms to children identified by the FDOE.

99.     DCPS schools are located in a state — Florida — that has never required mandatory masking.

100.    DCPS schools are located in a county — Duval County — that has never required mandatory masking.

101.    Notwithstanding that its schools are situated within the state *and* the county, both of which do not require masking indoors, DCPS irrationally, arbitrarily, and capriciously required higher levels of personal protective equipment be used by its students than what was required by similarly-situated adults and children who did not attend public schools in Duval County.

102.    DCPS irrationally, arbitrarily, and capriciously ignored the fact that its students were regularly unmasked while in the community at large, as were the parents and teachers outside of the DCPS schools.

103.    Finally, the FDOE notified DCPS that, "**we ask that districts, which are currently implementing a mandated face covering policy, revise their policy to be voluntary for the 2021-2022 school year**" (emphasis is original).

104.    Rather than receive this guidance backed by scientific data, DCPS went the other direction, and obstinately, irrationally, arbitrarily, and capriciously ignored the FDOE's official request that, if it implemented any mask mandate, such mandate would be unconditionally voluntary for the 2021-22 school year.

## The Department of Health's Unmasking Order

105.    The Defendant made a habit of ignoring the guidance of the Florida Department of Health and acted defiantly in crafting, adopting, and implementing the Mask Mandate.

106.    On April 29, 2021, the Florida Department of Health ("FDOH") categorically rescinded all of its guidance related to masking such that the FDOH no longer even *recommended* face masking - not even for adults, much less for children. A copy of the FDOH's order rescinding all its previous masking recommendations is attached hereto as **Exhibit E** (the "FDOH Unmasking Order").

107.    After FDOH rescinded its masking recommendation, DCPS, without any explanation, *stopped* following the guidance of the Florida Department of Health.

108.    DCPS was picking and choosing the source of authority that would support the Mask Mandate that it wished to impose on students. Selecting vague guidance from the CDC or FDA not based on State data was not a rational approach drawn from science or reason. Without scientific support, DCPS could not demonstrate a compelling governmental interest.

109.    DCPS irrationally, arbitrarily, and capriciously ignored the effect of the FDOH Unmasking Order, which removed even a voluntary masking suggestion throughout the State of Florida.  DCPS crafted, adopted, implemented, and continued to enforce the Mask Mandate *after* the FDOH unmasked Florida and *after* the state of Florida continued to outperform nearly all other states in the nation in terms of Covid-19 cases.

### The Governor's Emergency Orders and the New Law

110.    On May 3, 2021, the Governor of the State of Florida signed two emergency orders and a new law.[3]

---

[3] Following scientific evidence and data to a rational conclusion, the Governor signed Emergency Executive Orders 2021-101 and 2021-102, and signed SB 2006 into law.

111.    Demonstrating the express will of both the Executive and Legislative branches of the State's government, the two emergency orders and the new law suspended and/or cancelled all standing Covid-19 emergency orders at all county and municipal levels in Florida.

112.    In other words, DCPS's students were not required to wear masks anywhere *except* at school.

113.    DCPS's Mask Mandate was irrationally, arbitrarily, and capriciously premised on the magical belief that the Covid-19 virus can only spread on school property. If students did not wear masks when moving through the community at large, in their churches, at stores, when they get together in each other's homes, at birthday parties, in restaurants, and so forth, and even in their own homes with parents who were not required to wear masks anywhere, school masking accomplished nothing.

114.    DCPS irrationally, arbitrarily, and capriciously took a position opposed by the Governor, the Legislature, the Florida Department of Health, the Florida Department of Education, and common sense.

115.    As further evidence of these facts, DCPS ignored the Florida Department of Health's Emergency Rule (Rule No. 64DER21-12 titled Protocols for Controlling COVID-19 in School Settings) attached hereto as **Exhibit F**.

116.    DCPS further ignored the Florida Department of Health's superseding Emergency Rule (Rule No. 65DER21-15 similarly titled) attached as **Exhibit G.** The FDOH Emergency Rule required DCPS to provide an opt-out to all parents from the Mask Mandate at the parent's sole discretion.

## DCPS's Inexcusable Failure to Mitigate Aerosols

117.    As the CDC has acknowledged as established fact, Covid-19 is *not* primarily spread through large respiratory droplets as initially believed, but rather is spread through sub-micron-sized fine aerosolized particles.

118.    DCPS had actual knowledge of this fact as early as September 2020.

119.    The utility of masks, or "face coverings" as DCPS euphemistically refers to them, was always premised on the false belief that Covid-19 was primarily spread through large respiratory water droplets that are captured in the mask's fibers.

120.    The consensus is that Covid-19 is spread through fine sub-micron-sized aerosols where masks have no effect. The very fine particles simply travel with airflow as it exits the sides, bottom, and top of a student's or teacher's mask. With every inhalation and exhalation, these minuscule particles travel around the mask and even through the mask unimpeded.

121.    Covid-19 aerosols can remain suspended in midair in indoor rooms for up to 60 days if the air remains still.

122.   Therefore, the beneficial effects of masks — if there are any beneficial effects at all — are much less significant than other available mitigations. Mask benefits are outweighed by the harms and risks of harms attendant with involuntary masking.

123.   Specialists in airborne pathogens recommend improving indoor air quality as the first step in a "hierarchy of controls" for mitigating an indoor aerosol.

124.   Even if filters and ultraviolet lamps cannot quickly be installed in air systems, there are other quick, easy, and inexpensive steps that can be *immediately* taken to remove aerosols and vastly reduce the risk of spreading a virus.

125.   For example, until other mitigations become available, you could simply keep doors and windows open and allow fresh air to circulate the indoor air. Add some ordinary inexpensive fans and most aerosols can be removed from an indoor area in minutes. Moving and circulating air is inexpensive and does not harm anyone.

126.   In fact, the scientific consensus is that Covid-19 does not spread outdoors because of the constant air flow and ultraviolet radiation (sunlight). Therefore, making the indoor environment as much like the outdoors is a primary objective if reducing transmission and case counts is the goal.

127.   Despite having actual notice that Covid-19 is an airborne pathogen and having actual notice that interior air quality is the *primary* way to mitigate an airborne pathogen, DCPS de-prioritized and did not pursue these easy, simple, and inexpensive ways of slowing the spread of Covid-19.

128.   DCPS ignored the management of interior air quality as the easy fix, ignoring it altogether and failed to issue guidance to its schools as to how to maximize indoor air quality through air circulation and filtration systems.

129.   It is irrational and overly restrictive that DCPS ignored indoor air quality while pushing its Mask Mandate, which is fantastically more expensive, difficult to manage, and more harmful than other effective available mitigations.

130.   In its Emergency Rule, DCPS did not (because it could not) explain why it failed — and continued to fail — to implement the most simple, basic, and inexpensive steps for effectively mitigating an airborne pathogen.

131.   DCPS's tunnel vision leading it to the Mask Mandate at the exclusion of *every other mitigation tool* was irrational *at best* and was tragically harmful and destructive at worst.

### Specific Harms Caused by the Mask Mandate

132.   The Mask Mandate hurt the very students it intended to protect.

133.   There may be many students who were unaffected by the Mask Mandate and were well adjusted to wearing a mask for the entire school day.

42

Admittedly, the Mask Mandate likely did some psychological and emotional good for certain students who feared Covid-19. These students should be allowed to continue wearing face masks for as long as they see fit, and should be excluded from the Class.

134.    But other students – the Class members - were **harmed by face masks** in a variety of specific ways.

135.    Some students were harmed because the masks were uncomfortable and a distraction, and the Mask Mandate degraded their academic performance.

136.    Some students suffered from persistent headaches while wearing the masks at school - even kids who never experienced such headaches in the past.

137.    Some students experienced exacerbation of existing sensory issues or deficits, and the masks led to disciplinary problems for them due to their good-natured preference to sacrifice their mask compliance in an effort to learn.

138.    Some students developed dermatological conditions or eye infections arising from the wearing of masks.

139.    Some students had difficulty hearing teachers when teachers were masked, or they had difficulty seeing through their fogged glasses, and these students' academic performance suffered.

140.    Some students had difficulty learning ordinary language and social skills when they and their peers were masked, and their social development suffered as a result.

141.    Some students experienced anxiety when wearing a mask, or at the thought of having to wear a mask for an extended period of time.

142.    Some students had difficulty breathing when wearing a mask, especially when engaged in physical activity, and many of these students did not have pre-existing respiratory disorders.

143.    In May 2021, Dr. Michael Lauzardo, the University of Florida's Emerging Pathogens Institute's Covid-19 expert, testified under oath that there was no public health justification to compel a child to wear a mask if the child was experiencing *any* negative effects.

144.    In pursuit of its own objectives at the expense of certain students, DCPS's Mask Mandate compelled children to wear face masks despite these recognized, sub-clinical harms to a sizable portion of the county's students.

145.    The Mask Mandate was irrational and overly restrictive in that it prioritized one *potential* harm - Covid-19 - over the specific *actual* harms inflicted upon Plaintiffs' children by forced masking.

## The Exceptions to the Mask Mandate
## Were Insufficient and Violative of Fundamental Rights

146.   The text of the Mask Mandate provided exceptions for students who had medical, physical, psychological, or other health conditions.

147.   However, DCPS provided no published procedure for parents to obtain an exemption, and instead threw a medical certification form at these parents and expected them to figure it out.

148.   DCPS did not train its staff or teachers or administrators in how to determine the sufficiency of an exemption in the form of a completed Medical Certification.

149.   Instead, when Plaintiffs who believed their children qualified for an exemption based on clinical or sub-clinical conditions sought guidance from their "child's school", they received inconsistent and haphazard responses from DCPS officials and employees with absolutely no qualifications or training to opine on something as sensitive as a child's medical, physical, psychological, and other health conditions.

150.   Parents who followed this up by suggesting that they must send their children to school without a mask despite the school's determination regarding the sufficiency of the Medical Certification were threatened that their child would be turned away and denied access to the school, or the school would discipline the child.

151.    When parents submitted completed Medical Certifications on behalf of their children, some were met with silence and indecision, receiving no formal response, and left to wonder if their child would have been able to continue attending school without being harmed by the Mask Mandate. Other parents were notified out of the blue that the signed Medical Certification they submitted was deemed insufficient and that their children would be re-masked against their will.

152.    Other parents were unequivocally told that their child did not qualify for an automatic exemption despite known medical, physical, psychological, and other health issues that DCPS previously accommodated, and no process to appeal the decision could be explained by DCPS or its teachers or administrators.

153.    In any case, the review process was undefined and the qualifications of those DCPS agents making sufficiency determinations were unknown. But, based on information and belief, someone reviewed the medical certifications and applied some sort of nebulous criteria in determining the adequacy of the submitted exemptions.

154.    DCPS never disseminated guidance or information to DCPS parents in a broadly distributed and uniform manner to educate them on the sufficiency review and appeals process, nor did DCPS inform DCPS parents who within the bureaucracy made these determinations.

155.    In other words, whatever the process behind the DCPS curtain, the School Board and the Superintendent illegally imposed unauthorized amendments to the Mask Mandate that were never noticed, set for public hearing, or even voted upon.

156.    The illegally imposed unauthorized amendments to the Mask Mandate occurred outside the Sunshine Laws, violating civil and criminal statutes.

157.    Egregiously, DCPS did not provide any procedure for withholding a signed Medical Certification for a particular student and bearing the personal information of a licensed health care provider from public records and keeping it confidential, or otherwise provide any guarantees to health care professionals, parents, and students that their identities and sensitive personal information would be kept confidential and undisclosed.

158.    Some parents discovered that, in this age of cancel culture, their health care providers were unsurprisingly reluctant to wade into fierce social and political controversies like the Mask Mandate by putting their names on medical certifications that would (potentially) immediately be published after being put into public records. Some were just as fearful that with no controls in place to guard against the unauthorized sharing of this sensitive information within DCPS, their names would be leaked, their professional reputations attacked, and their children would suffer retaliation.

159.   Furthermore, many kinds of harms - poor academic performance, delayed language development, persistent unexplained headaches, depressed social development, and developing anxiety disorders - were not harms which family practice physicians would normally "certify" or hold any qualifications to certify.

160.   Plaintiffs and other similarly situated families were left to seek out the appropriate specialists to address and properly "certify" these harms, incurring a significant financial burden, emotional toll, and additional stress in getting their child exempted, only so they could immediately turn around and share this most private information with their "child's school", and within it, who knows.

161.   For all intents and purposes, there was no consistently effective exception to the Mask Mandate, and DCPS did not articulate one. Rather, DCPS made things more difficult for parents by repeatedly altering its cloaked definition of who qualified as a licensed health care provider, and thereby deeming previously submitted medical certifications invalid.

**The Florida Constitution's Rights to Due Process and Privacy**

162.   The Florida Constitution guarantees that citizens — including students — shall not "be deprived of life, liberty, or property without due process of law." Citizens also have the constitutional "right to be let alone and free from governmental intrusion into the person's private life[.]"

163.   Students and "[m]inors are natural persons in the eyes of the law and "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, . . . possess constitutional rights." *In re T.W.*, 1989 Fla. LEXIS 1226 *21 (Fla. 1989) (internal citations omitted)

164.   Florida's Constitution also guarantees that similarly situated citizens be treated the same, and not in any irrational, arbitrary, or capricious manner.

165.   On June 19, 2020, Florida Governor Ron DeSantis rightly stated that wearing masks must be voluntary because "the Constitution is not suspended just because there is a virus."

166.   The Florida Constitution's privacy right is very broad. It "embraces more privacy interests and extends more protection to the individual in those interests, than does the Federal Constitution." *In re T.W.*, 551 So.2d 1186, 1193 (Fla. 1989).

167.   The Florida Constitution also guarantees that "No person shall be deprived of life, liberty, or property without due process of law." Article I, §9, Fla. Const.

168.   In order to invade a citizen's fundamental right of privacy, DCPS must meet a "strict scrutiny" standard. *N. Fla. Women's Health & Counseling Servs., Inc. v. State*, 866 So.2d 612, 635 (Fla.2003) ("Florida courts consistently have applied

49

the 'strict' scrutiny standard whenever the Right of Privacy Clause was implicated, regardless of the nature of the activity"). "As defined by the Supreme Court, article I, Section 23's guarantee of bodily and personal inviolability — which we are asked to follow — must include the inviolability of something so intimate as one's own face. A person then reasonably can expect to be free from governmental coercion regarding what he puts on it." *Id.*

169.   To withstand strict scrutiny, a law must be necessary to promote a compelling governmental interest and must be *narrowly tailored* to advance that interest.  *J.P.*, 907 So. 2d at 1110.

170.   Strict scrutiny required Defendant to show that the challenged Mask Mandate served a compelling state interest and accomplished its goal through the use of the *least restrictive* means. *See Winfield v. Div. of Pari–Mutuel Wagering*, 477 So.2d 544 (Fla. 1985) (explaining that where a law intrudes on the fundamental right to privacy guaranteed in Florida's Constitution, the State must demonstrate that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means).

171.   Where strict scrutiny is required, the offending legislation is **presumed to be unconstitutional,** and **the Defendant has the burden** of proving that the law passes muster. *N. Fla. Women's Health & Counseling Servs., Inc.*, 866 So.2d at 625 n.16 ("The legislation is presumptively unconstitutional … the State

must prove that the legislation furthers a compelling State interest through the least intrusive means").

### The Mask Mandate Did Not Satisfy Strict Scrutiny

172.   The School Board did not articulate a compelling interest in its Emergency Rule.

173.   Based upon reasonable inferences, DCPS's compelling interest was to "achieve a uniform, efficient, and safe school system" and reduce the number of Covid-19 cases reported in the DCPS system.

174.   The Mask Mandate failed in its intended purpose, resulting in non-uniform application of a vague and ill-defined Rule, exemptions to some with clinical and sub-clinical harms but not others, and made the DCPS system more inefficient with parents' and teachers' and administrators' attention directed towards enforcement of the Mask Mandate and challenges over hopelessly invasive medical certifications. Further, the Mask Mandate provably did nothing for safety and had no effect on Covid-19 case counts as borne out in the Florida data comparing masked and unmasked populations over the last two school years, all while harming certain children in the process.

175.   To recap, the Mask Mandate was non-uniform, inefficient, and unsafe.

176.    The DCPS Mask Mandate was not scientifically supported, and thus could not serve a compelling governmental interest purportedly to reduce the number of Covid-19 cases within the DCPS system.

177.    With the absence of masking in the broader community, compelling kids to wear masks seven or eight hours per day does not affect the exposure of the student and teacher population, who will be exposed outside of school, and cases proceeded as if no Mask Mandate was ever implemented by DCPS. The precipitous statewide drop in cases over the first two months that the Mask Mandate was in effect, and in the vast majority of Florida county school districts that did not adopt forced masking policies bears this out.

178.    On May 4, 2020, the State of Florida's Covid-19 Task Force published a Report[4] called "Plan for Florida's Recovery" (the "Plan") that described various scenarios under which citizens should "consider" using masks. Nothing in the Plan suggested that masks should be mandatory.

179.    The Plan identified seven "Guiding Principles."

180.    The Plan's fifth Guiding Principle is "Protecting Civil Rights:"

Measures taken by the government must not impair the fundamental rights of Floridians, and when **restrictive measures** are imposed, they should be **the least restrictive measures feasible** to accomplish a **specific <u>medically necessary</u> objective**.

---

[4] *Available online* at https://www.flgov.com/wp-content/uploads/covid19/Taskforce%20Report.pdf.

Florida's Re-Opening Task Force Report, p. 7 (emphasis added).

181.   DCPS's Mask Mandate impaired the fundamental rights of the Plaintiffs.

182.   The mandatory masking of all DCPS students did not accomplish any specific medically necessary objective and ignored every other specific medically necessary consideration.

183.   DCPS's Mask Mandate did not use the least restrictive measures feasible to accomplish any specific medically necessary objective.

184.   The Mask Mandate was declared unlawful. *See* Order entered by First District Court of Appeal on Oct. 29, 2021 attached as **Exhibit H**; *see also* Order Granting Writ of Mandamus entered Nov. 12, 2021 attached as **Exhibit I**.

## Class Action Allegations

185.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons, including parents and their children, within Duval County subject to the Mask Mandate.  Excluded from the Class are all persons, including parents and children, who desired to have their children masked and/or attend school while masked irrespective of the Mask Mandate.

186.   The claims belonging to the Class are so numerous that joinder of all individual members is impractical.

187.    The claims raised by Plaintiffs are typical of the claims of the class members, and all claims are based on the same legal and remedial theories.

188.    There are common questions of law and fact that relate to and affect the rights of each member of each Class, and these questions predominate over any questions affecting only individual class members. The common questions of law and fact for this lawsuit include the following:

    a.  Whether all Class Members were subject to the Mask Mandate;

    b.  Whether all Class Members were forced to mask their children against their better judgment;

    c.  Whether the Mask Mandate violated the rights of the Class Members;

    d.  Whether the Mask Mandate violated the Class Members' Constitutional Rights of Privacy;

    e.  Whether the Mask Mandate violated the Class Members' Constitutional rights under the Parents Bill of Rights;

    f.  Whether the Mask Mandate violated the Class Members' Due Process rights; and

    g.  Whether the Mask Mandate violated the Class Members' Equal Protection rights.

189.    The claims of the named Plaintiffs are typical of the claims of the

Class in that the claims of all class members are based on the Defendants' violation of fundamental and constitutional rights. The named Plaintiffs are similarly situated with all Class members, and they have sustained damages similar to those sustained by the members of the Class they seek to represent. Plaintiffs were wronged, they seek to obtain redress of the wrong, and they seek to prevent the Defendants from perpetrating similar wrongs on others.

190.    The named Plaintiffs will fairly and adequately protect the interests of all Class members in the prosecution of this action. The named Plaintiffs are representative of all individuals in the Class and will fairly and adequately protect the interests of the entire Class. There is no conflict between the named Plaintiffs and other members of the Class with respect to this action or with respect to the claims for relief set forth herein. Plaintiffs have retained the services of attorneys who are experienced and capable in prosecuting class action lawsuits.

191.    Maintaining this action as a class action is superior to all other available methods of adjudication because it will promote the convenient administration of justice and will achieve a fair and efficient adjudication of the controversy in this matter, which will affect the interest of hundreds of potential class members.

192.    The prosecution of separate actions by or against individual

members of the Class would create a risk of inconsistent or varying adjudications that would confront the Defendants with incompatible standards of conduct.

193.    The prosecution of separate actions by or against individual members of the Class would also create a risk of adjudication with respect to individual members of the Class that would, as a practical matter, substantially impair, impede, or be dispositive of the interests of other members of the Class who are not parties.

194.    The lawsuit is manageable as a class action because the proofs are essentially the same for all members of the Class on all of the principal issues.

195.    Given the common issues that predominate throughout this lawsuit, as well as the expenses associated with litigation, it is far more cost effective for the Class and the Defendants to proceed with this lawsuit as a class action.

196.    It is probable that the amount that may be recovered by the individual Class members will be large enough in relation to the expense and effort of administering the action to justify a class action because of the size of the class and the amount of damages sustained by the Class members.

197.    Individual Class members do not have a significant interest in controlling the prosecution of separate actions involving the subject matter of this litigation because the claims relate to violation of fundamental and constitutional rights.

## Summary / Conclusion

198.   The Mask Mandate imposed a restrictive measure.

199.   The Mask Mandate was not medically necessary to a specific objective.

200.   There was a significant likelihood of irreparable harm to the Plaintiffs known to the Defendant due to the Defendant's deprivation of Plaintiffs' Constitutional and fundamental rights.

201.   Plaintiffs lacked an adequate remedy at law at the time the Mask Mandate was enforced and were required to bring a Petition for a Writ of Mandamus to vindicate their Constitutional and fundamental rights.

202.   The harm to Plaintiffs and their children, and the deprivation of the Plaintiffs' Constitutional Rights, can now be remedied by money or judgment.

203.   The Plaintiffs and their children fear they will not be left alone and free from government interference, specifically by the Defendant, if justice is not done in this action.

204.   DCPS's Mask Mandate was facially and presumptively invalid since it implicated and infringed the Plaintiffs' fundamental Constitutional Rights.

205.   Awarding damages caused by Defendant's Mask Mandate to the Class members will serve the public interest. All school children, parents, teachers, and staff were unduly burdened by Defendant's irrational, arbitrary, and

capricious over-reach in a fashion never seen before in the history of Florida. Not only was it irrational, but the mask requirement violated the Plaintiffs' fundamental Florida Constitutional Rights. The Right of Privacy was destroyed by forced masking and the medical certification "process". The public has a strong interest in protecting their rights, keeping children from harm, and allowing students and their parents to make informed decisions and exercise liberty and medical autonomy.

206.    Plaintiffs have been injured and will continue to be injured as a result of the Mask Mandate.

207.    The Plaintiffs have been forced to incur attorney's fees and expend costs in order to prosecute this action.

## COUNT I
## Violation of 42 U.S.C. §1983 – Right of Privacy

208.    Paragraphs 1 - 207 are incorporated by reference.

209.    This claim is brought pursuant to 42 U.S.C. §1983 for infringement of rights under color of state law. The conduct complained of, and specifically the Defendant's adoption and implementation of the Mask Mandate, was committed by a person and/or persons acting under color of state law.

210.    This is a civil rights action for money damages pursuant to Title 42 U.S.C. §1983 for deprivation of Plaintiffs' constitutional rights of Privacy pursuant to Article I, Section 23, Fla. Const.

211.    As more fully described above, the Duval County School Board had actual and/or constructive knowledge that its Mask Mandate adopted and implemented during Plaintiffs' enrollment and attendance at Duval County Public schools posed a foreseeable, pervasive, and unreasonable risk of constitutional injury to Plaintiffs.

212.    The Right of Privacy under Florida's Constitution includes the right to bodily autonomy and medical decision-making. "As defined by the Supreme Court, Article I, Section 23's guarantee of bodily and personal inviolability — which we are asked to follow — must include the inviolability of something so intimate as one's own face. A person then reasonably can expect to be free from governmental coercion regarding what he puts on it." *Green v. Alachua Cty.*, 323 So. 3d 246, 253 (Fla. 1st DCA 2021).

213.    Article I, Section 23 of the Florida Constitution provides that "[e]very natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein."

214.    Plaintiff students and their parents are natural persons residing in Florida.

215.    A rule requiring a child to covering his or her face is intrusive — and is a clear invasion of the child's bodily autonomy, i.e., privacy.

216.   A rule requiring a child to involuntarily use face coverings or masks that implicate personal medical decisions is a clear invasion of the child's bodily autonomy, i.e., privacy.

217.   A rule requiring a child to disclose the existence of medical conditions unrelated to the specific disease that the governmental agency is trying to mitigate is a clear and absolute violation of the child's privacy.

218.   A rule requiring a parent to disclose the existence of medical, physical, psychological, or other health conditions affecting their child and unrelated to the specific disease to be mitigated is a clear and absolute violation of the family's privacy.

219.   A rule requiring parents and children to disclose the existence of medical, physical, psychological, or other health conditions of which the governmental agency would otherwise remain unaware were it not for the compulsory disclosure is an egregious violation of both the parent's and the child's right to privacy.

220.   The Mask Mandate also required healthy, previously infected and/or vaccinated students to comply notwithstanding such compliance serves no purpose and only causes them harm in other ways - prioritizing prevention of a low probability potential harm (Covid-19) over actual harm and disregarding the

independent judgment of these Florida citizens and children who desire to remain mask free.

221.   The Defendant implicitly admitted that the Mask Mandate did children harm by providing for exemptions based upon certain medical, physical, psychological, or other health conditions.

222.   DCPS's unconstitutional Mask Mandate was a radical infringement on the well-settled constitutional and human right to privacy shared by all Floridians, which includes our rights to self-determination, bodily autonomy, medical freedom, and liberty. *J.P.*, 907 So. 2d at 1115. "As defined by the Supreme Court, Article I, Section 23's guarantee of bodily and personal inviolability—which we are asked to follow—must include the inviolability of something so intimate as one's own face. A person then reasonably can expect to be free from governmental coercion regarding what he puts on it." *Green v. Alachua County*, 2021 Fla. App. LEXIS 8634 *13 (Fla. App. Ct. 2021).

223.   The infringement of an interest protected by statute or otherwise constitutes an injury in fact.

**WHEREFORE**, Plaintiffs request the Court to find that Plaintiffs were deprived of constitutional rights, specifically their and their children's Right to Privacy, and award Plaintiffs their attorney's fees and costs, special damages, and general damages. Plaintiffs also pray that this Court award damages in the form

of reasonable attorneys' fees and costs as provided under 42 U.S.C. §§1983 and 1988.

## COUNT II
## Violation of 42 U.S.C. §1983 – Violation of the Parents Bill of Rights

224.    Paragraphs 1 - 207 are incorporated by reference.

225. This claim is brought pursuant to 42 U.S.C §1983 for infringement of rights under color of state law. The conduct complained of, and specifically the Defendant's adoption and implementation of the Mask Mandate, was committed by a person and/or persons acting under color of state law.

226.    The Mask Mandate was a violation of the Parents' Bill of Rights, pursuant to Fla. Stat. §1014.01 et seq.

227.    "[I]t is a fundamental right of parents to direct the upbringing, education, and care of their minor children." Fla. Stat. §1014.02.

228.    The Mask Mandate violated the statutory right of the Plaintiffs to direct the upbringing, education, and care of their children.

229.    In direct violation of the Parents' Bill of Rights, DCPS's Mask Mandate usurped the rights of these Plaintiffs and compelled the parents to allow for education and care of their children in violation of the Plaintiffs' personal beliefs.

230.    DCPS was required to, but could not, demonstrate that it infringed on the fundamental rights of the Plaintiffs using reasonable and necessary action to

achieve a compelling state interest, and that DCPS's Mask Mandate was narrowly tailored and is not otherwise served by a less restrictive means.

231.   DCPS is a political subdivision and governmental entity of the State and could not enforce the Mask Mandate absent the requisite showing. The Emergency Rule and the "emergency" meeting, nor any of the follow-up guidance from DCPS, have failed to discuss or demonstrate how the Mask Mandate is narrowly tailored, or why DCPS's ends were not served by a less restrictive means.

232.   Plaintiffs will show that there were feasible, less restrictive means available to DCPS that could have achieved DCPS's desired outcomes (assuming that outcome was something besides forcing every kid in DCPS schools to wear a mask for political sport).

233.   "All parental rights are reserved to the parent of a minor of this state without obstruction or interference from the state, any of its political subdivisions, any other governmental entity, or any other state institution" [.] Fla. Stat. §1014.04.

234.   Further, the "rights of a parent of a minor child in this state" expressly include:

a)   The right to direct the education and care of his or her minor child.

b)   The right to direct the upbringing and the moral or religious training of his or her minor child.

c)   [omitted intentionally]

d)      The right . . . to access and review all school records relating to his or her minor child.

e)      The right to make health care decisions for his or her minor child, unless otherwise prohibited by law.

f)      The right to access and review all medical records of his or her minor child . . . .

235.    DCPS's Mask Mandates violated the provisions above in reinforcing moral training not desired by the parent Plaintiffs, failed to provide an adequate process and assurances that the Plaintiffs would receive the medical records created by DCPS in processing the Medical Certifications submitted, and decided *for the* Plaintiff parents which health, medical and psychological conditions the Plaintiffs should have prioritized.

236.    The rights of parents to make health care decisions for their minor children, as enshrined in (e) above, is not otherwise prohibited by law, and in fact has been fortified by FDOH's Emergency Rule 64DER21-15 requiring that parents have sole discretion to direct masking of their children.

237.    Further, "a parent of a minor child in this state has inalienable rights that are more comprehensive than those listed in this section, unless such rights have been legally waived or terminated." Fla. Stat. §1014.04(4).

238.   The Plaintiffs have not waived their fundamental, inalienable legal rights.

239.   DCPS lacked the power or authority to terminate the Plaintiffs fundamental, inalienable legal rights.

240.   DCPS, and the School Board, should have developed and implemented policies allowing for a parent to object to instructional materials and other materials used in the classroom, and parents should have been expressly given the ability to object based upon moral and religious beliefs or simply upon the belief that such materials are harmful. *See,* Fla. Stat. §1014.05(1)(c).

241.   The Mask Mandate compelled the usage of masks, which were indisputably materials used in the classroom.

242.   Plaintiffs should have been allowed to object to those materials based upon their moral and religious beliefs or based upon their belief that the materials used were harmful, and DCPS did not provide a policy to allow the Plaintiff parents to object on moral, religious, or harmful grounds – instead providing only a medical opt-out policy through the Medical Certification.

243.   DCPS should have provided procedures for a parent to learn about parental rights and responsibilities under general law, including: (6) the right of a parent to inspect district instructional materials; and (11) the right of a parent to

opt out of any district-level data collection relating to his or her minor child not required by law. *See*, Fla. Stat. 1014.05(1)(f).

244.   The Plaintiffs and other similarly-situated parents requested and were denied the procedures and instructional materials provided by DCPS to its staff and employees regarding the Mask Mandate.

245.   Similarly, DCPS did not provide and refused to provide specificity regarding the data collection underway through collection of the Medical Certification forms and how a parent could have opted out of the requirement due to concerns over unauthorized data collection.

246.   The Plaintiffs and other similarly-situated parents have requested the information required under Fla. Stat. §1014.05 and the Superintendent has failed to provide such information within the requisite 10-day period.

**WHEREFORE**, Plaintiffs request the Court to find that Plaintiffs were deprived of constitutional rights, specifically the rights guaranteed by the Florida Parents Bill of Rights, and award Plaintiffs their attorney's fees and costs, special damages, and general damages. Plaintiffs also pray that this Court award damages in the form of reasonable attorneys' fees and costs as provided under 42 U.S.C. §§1983 and 1988.

## COUNT III
### Violation of 42 U.S.C. §1983 – Equal Protection

247.   Paragraphs 1 – 207 are incorporated by reference.

248. This claim is brought pursuant to 42 U.S.C §1983 for infringement of rights under color of state law. The conduct complained of, and specifically the Defendant's adoption and implementation of the Mask Mandate, was committed by a person and/or persons acting under color of state law.

249.    The Florida Constitution's Declaration of Rights, Section 1, which reads "all men are equal before the law . . . ," is the source of Florida's equal protection inhibition. *Ga. So. & Fla Ry. v. Seven-up Bottling Co.*, 175 So.2d 39, 40 (Fla. 1965), *quoting from Davis v. Fla. Power Co.*, 64 Fla. 246, 60 So. 759 (1913).

250.    There must, under our Florida Charter, be "some just relation to, or reasonable basis in, essential difference of conditions and circumstances with reference to the subject regulated, and [the statute] should not merely be arbitrary ... ." *Eslin v. Collins*, 108 So.2d 889, 891.

251.    In addition, a class should include all those similarly situated, unless there are practical differences sufficient to warrant a special classification. *See Ga. So., supra* note 1.

252.    Plaintiffs are free to enter grocery stores, attend birthday parties, and enter public, governmental buildings throughout Duval County without being required to wear face coverings or face masks under threats of disciplinary action or criminal prosecution.

253.   The Mask Mandate unconstitutionally made children in schools second-class citizens before the law by arbitrarily imposing the masking requirement in school without any essential difference in conditions in school versus outside of school.

254.   The Mask Mandate provides an exemption process for those who are able to obtain a Medical Certification from a licensed health care provider but did not allow for exemptions and opting-out for those unable to secure a Medical Certification from a licensed health care provider despite a legitimate and actual medical, physical, psychological, or other health condition making masks contraindicated.

255.   The Mask Mandate discriminated against those without access to a licensed health care provider and those with sub-clinical harms from masks that did not qualify as sufficient medical, physical, psychological, or other health conditions under the Board's interpretation.

256.   The Mask Mandate did not exempt those who had documented medical, physical, psychological, or other health conditions known to the student's school through prior documentation including, but not limited to, the accommodations required through an IEP or 504 Plan, but were otherwise unable to obtain a signed Medical Certification.

257.    Furthermore, the Mask Mandate, as applied, arbitrarily exempted, or co-opted children based on a non-uniform sufficiency review process once Medical Certifications were submitted, the Defendant having notified certain parents and students that their Medical Certifications were deemed insufficient despite full compliance with the Defendant's Emergency Rule, providing disparate treatment within a class.

258.    There was no rational basis for not exempting those who can demonstrate sub-clinical harms or those with documented conditions of which the Defendant had prior knowledge.

259.    There was no rational basis for not exempting those who provided Medical Certifications from licensed health care providers in all instances, since the Emergency Rule was implemented, and Plaintiffs and other similarly-situated parents and students reasonably relied upon the express language of the Mask Mandate.

260.    Defendant's Mask Mandate, encapsulating its deficiencies in treating equally-situated students as equal before the law, bears no rational relationship to a legitimate government interest and violates the Florida Constitution's Equal Protection Clause. *N. Broward Hosp. Dist. v. Kalitan*, 219 So. 3d 49, 55 (2017).

261.    The Mask Mandate violated the Equal Protection clause of the Florida Constitution and is void.

262.    There was a bona fide dispute regarding citizen's rights and duties under the Mask Mandate.

**WHEREFORE**, Plaintiffs request that the Court declare that the Defendant's Emergency Rule compelling students to wear face coverings was an unconstitutional violation of the Equal Protection Clause under the Florida and U.S. Constitutions, and award Plaintiffs their attorney's fees and costs, special damages, and general damages. Plaintiffs also pray that this Court award damages in the form of reasonable attorneys' fees and costs as provided under 42 U.S.C. §§1983 and 1988.

## COUNT IV
### Violation of 42 U.S.C. §1983 – Due Process

263.    Paragraphs 1 - 207 are incorporated by reference.

264.    This claim is brought pursuant to 42 U.S.C §1983 for infringement of rights under color of state law. The conduct complained of, and specifically the Defendant's adoption and implementation of the Mask Mandate, was committed by a person and/or persons acting under color of state law.

265.    This is a civil rights action for money damages pursuant to Title 42 U.S.C. §1983 for deprivation of Plaintiffs' constitutional rights of Privacy pursuant to Article I, Section 23, Fla. Const.

266.    Article I, §2 of the Florida Constitution guarantees that the state may not deprive any person of life, liberty, or property without due process of law.

267.    The Mask Mandate was unconstitutional. It violated the Due Process Clause of Article I, §9 of the Florida Constitution because it deprived Plaintiffs and their children of life, liberty, or property without due process of law.

268.    DCPS's failure to provide a clear, transparent, and consistent process for submission of exemptions through Medical Certifications, and the arbitrary denial of submitted Medical Certifications, is a deprivation of life, liberty, or property without due process of law.

269.    DCPS further failed or refused to allow for an adjudicative process to challenge denials of Medical Certifications, with such denials being made by an unidentified DCPS official or officials.

270.    Defendant's unlawful Mask Mandate and its associated procedures and processes are an arbitrary and unreasonable exercise of governmental power. *Noel v. State*, 191 So. 3d 370, 373 (Fla. 2016).

271. The Superintendent and DCPS purported or threatened to impose disciplinary measures upon Plaintiffs' children should Plaintiffs have followed the FDOH's Emergency Rule, which preserved the ability for Plaintiffs and similarly-situated parents to opt their children out of mask wearing at their sole discretion.

272.    The disconnect between the FDOH's Emergency Rule, the Parents'

Bill of Rights, and DCPS's Mask Mandate left the Plaintiffs as Florida citizens unclear as to whether they may nonetheless be wrongfully prosecuted or disciplined, or indeed, exactly what conduct is proscribed, and DCPS's enforcement in this context is an unconstitutional deprivation of Plaintiffs' life, liberty, or property.

273.   There is a present bona fide dispute regarding citizen's duties under the Emergency Rule.

**WHEREFORE**, Plaintiffs request that the Court declare that the Defendant's Emergency Rule compelling students to wear face coverings was an unconstitutional violation of the due process rights guaranteed under the Florida and U.S. Constitutions, and award Plaintiffs their attorney's fees and costs, special damages, and general damages. Plaintiffs also pray that this Court award damages in the form of reasonable attorneys' fees and costs as provided under 42 U.S.C. §§1983 and 1988.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

**DATED** this 18th day of April, 2022.

ANDERSONGLENN LLP

*/s/ Gregory A. Anderson*

**Gregory A. Anderson, Esquire**
Florida Bar Number: 398853
gaanderson@asglaw.com

72

**Nicholas P. Whitney, Esquire**
Florida Bar Number: 119450
nwhitney@asglaw.com
10751 Deerwood Park Boulevard, #105
Jacksonville, Florida 32256
Telephone: (904) 273-4734
Facsimile: (904) 273-4712
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April, 2022, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Middle District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

**ANDERSONGLENN LLP**

*/s/ Gregory A. Anderson*
**Gregory A. Anderson, Esquire**
Florida Bar Number: 398853
gaanderson@asglaw.com
**Nicholas P. Whitney, Esquire**
Florida Bar Number: 119450
nwhitney@asglaw.com
10751 Deerwood Park Boulevard, #105
Jacksonville, Florida 32256
Telephone: (904) 273-4734
Facsimile: (904) 273-4712
*Attorneys for Plaintiffs*